

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-82,126-02

## EX PARTE CARMEN MEJIA, Applicant

## ON APPLICATION FOR A WRIT OF HABEAS CORPUS
## CAUSE NO. D-1-DC-04-904057-B
## IN THE 167TH DISTRICT COURT
## TRAVIS COUNTY

FINLEY, J., filed a concurring and dissenting opinion in which PARKER, J., joined.

## CONCURRING & DISSENTING OPINION

Applicant was convicted of felony murder, injury to a child, and injury to a child by omission and was sentenced to three terms of life imprisonment. Her instant habeas application raises four claims: (1) false evidence; (2) Article 11.073; (3) actual innocence; and (4) ineffective assistance of trial counsel. The habeas court recommends we grant Applicant relief on all grounds. The Court's *per*

*curiam* opinion grants relief on Applicant's actual innocence ground, citing *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), and *Ex parte Tuley*, 109 S.W.3d 388 (Tex. Crim. App. 2002), and declares Applicant "actually innocent."

I disagree with our decision to do so for three reasons. First, Applicant's *Elizondo* claim is barred as subsequent under Code of Criminal Procedure article 11.07, Section 4(a)(1). *See* TEX. CODE CRIM. PROC. art. 11.07, § 4(a)(1). The "factual . . . basis" for Applicant's *Elizondo* claim—Applicant's daughter's admission that she caused the injuries to the decendent—was not only available at the time of Applicant's prior writ but was available at Applicant's trial in the form of testimony admitted to the jury. Second, even if we were to review the merits of Applicant's *Elizondo* claim, Applicant fails to meet *Elizondo*'s "herculean burden." *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). Third, this Court should not be in the business of declaring successful *Elizondo* habeas applicants "actually innocent." *See Ex parte Cacy*, 543 S.W.3d 802, 804 (Tex. Crim. App. 2016) (YEARY, J., concurring) ("[T]hough I remain content to grant habeas relief to any applicant who satisfies the *Elizondo* standard, I would avoid the label of actual innocence.").

That leaves Applicant's remaining claims. Applicant's false evidence and ineffective assistance of counsel claims are also barred for the same reasons as

Applicant's *Elizondo* claim. However, under *Ex Parte Robbins*, 478 S.W.3d 678 (Tex. Crim. App. 2014), Applicant's Article 11.073 claim is not. Based on the record before us, Applicant is entitled to Article 11.073 new science relief because the scientific evidence that the State relied upon at Applicant's trial—the medical examiner's conclusion that the death was a homicide—has now been contradicted by new relevant scientific evidence that was unavailable at the time of trial and which proves by a preponderance of the evidence that, had this scientific evidence been presented at Applicant's trial, Applicant would not have been convicted. *See Robbins*, 478 S.W.3d at 692. Consequently, Applicant is entitled to habeas relief, just not in the way the Court grants it. For the following reasons, I concur in the Court's decision to grant Applicant a new trial but dissent insofar as the Court does so on actual innocence grounds.

## I. Factual Background

### a. Offense & Trial

Applicant was indicted for one count of felony murder, one count of injury to a child, and one count of injury to a child by omission related to the death of A.C., a ten-month-old. At trial, the State elicited testimony that A.C. had been living with his father, Mauro Casiano, for one week in the duplex that Applicant and her family rented. Casiano paid Applicant to care for A.C. while Casiano was

at work. On the day of his death, A.C. was in Applicant's care. A.C. sustained third-degree burns on seventy percent of his body that ultimately caused fatal organ failure.

Dr. Keith Kerr, a pediatric intensive care physician, testified at Applicant's trial that he treated A.C. at St. David's Hospital and tried to stabilize A.C.'s body temperature and blood pressure to be able to safely transfer A.C. to the pediatric intensive care unit at Brackenridge Children's Hospital. Dr. Kerr testified that "full thickness burns" covered about seventy percent of A.C.'s body, beginning across his chest and covering the rest of his body down to his feet. A.C.'s skin was red and had peeled off in some places. Dr. Kerr also discussed A.C.'s non-burn injuries, which included bruising to the right side of A.C.'s head that indicated trauma. Dr. James Jackson, who treated A.C. in the emergency room at St. David's, testified that A.C. appeared "critically ill" when he arrived at the hospital. Dr. Jackson also discussed the bruising to A.C.'s head but admitted it could have been caused during A.C.'s treatment. Brooke Shertzer, a social worker at St. David's Hospital who did not treat A.C., testified that she saw that A.C. had "severe burns" and was "extremely red."

At Applicant's trial, the State argued that Applicant intentionally held A.C. down in scalding bathwater and caused the third-degree burns that led to his death.

The State heavily emphasized Applicant's several different explanations for A.C.'s injuries to both hospital personnel and law enforcement. Applicant first told Shertzer that while A.C. and one of her sons had been playing in the kitchen, A.C. shook the stove and caused a pot of boiling water to fall on him. Doctors determined this explanation was inconsistent with A.C.'s injuries. Dr. Kerr testified that A.C.'s burns were not consistent with a pot of water having fallen on him and were more consistent with A.C. having been held in scalding water: "The child was struggling not to be in the water, but obviously somebody determined that that is not what was going to happen." A.C.'s back was spared from the burns, which Dr. Kerr concluded meant that someone had their hand on A.C.'s back to protect their hand from getting burned and was "obviously consistent with someone doing it on purpose." On cross-examination, Dr. Kerr testified that even though he was not aware of the circumstances surrounding A.C.'s burns, the burn patterns suggested to him that they were not sustained accidentally.

Applicant told detectives the pot-of-water story during her interview. Law enforcement also determined that the evidence at Applicant's apartment was inconsistent with this explanation. Detective Robert Merrill, who investigated Applicant's case, testified that A.C.'s injuries were inconsistent with A.C. pulling a pot of water onto himself. He testified that he measured Applicant's stove and

determined it was too tall for a child of A.C.'s age to have reached the stovetop. Detective Merrill also testified that he and Detective Rogelio Sanchez had conducted a water test. The hot water heater in the bathroom was set between 140 to 150 degrees, and the water heated to 147.8 degrees at the "top end."

Detective Sanchez interviewed Applicant after A.C. died, during which Applicant offered other explanations for A.C.'s injuries. Applicant told Detective Sanchez that A.C. had gotten in the tub on his own, and her daughter Ana Patricia[1] had told her to tell the pot-of-water story. A.P. was about three years old at the time A.C. was burned. Applicant then told Detective Sanchez that Casiano was abusive towards A.C. and that he had raped Applicant. Applicant said that Casiano had intentionally burned A.C. because he was angry that Applicant refused his sexual advances. Applicant also said that Casiano had threatened to kill her and her husband if they told law enforcement what he had done. Detective Sanchez testified that Casiano had an alibi for both the alleged rape and the death of A.C., which was corroborated by the timekeeper and other employees at Casiano's worksite. After Detective Sanchez informed Applicant that he did not believe her

---

[1] As Applicant's habeas counsel notes, Applicant's daughter Ana Patricia has been adopted and has officially changed her name since she testified at Applicant's trial. She testified at Applicant's habeas hearing under the initials A.P. and will be designated as such for the remainder of this opinion.

story was true, she told him that her daughter Jennifer had put A.C. in the bathwater while Applicant was breastfeeding her infant daughter. Tapes of Detective Sanchez's interview with Applicant were played for the jury, though Applicant's explanation that Jennifer was responsible for A.C.'s injuries was not recorded.

Phylip Peltier, a retired police officer who consulted on A.C.'s burns, testified that based on his review of the photos of A.C.'s injuries, A.C. was likely held down by an adult under his armpits and deliberately submerged in the scalding water. Peltier rebutted all of Appellant's explanations for A.C.'s injuries and said that none were consistent with the burns that A.C. sustained. The chief medical examiner for Travis County, Roberto Bayardo, testified that based on his review of A.C.'s autopsy, A.C.'s death was a homicide and that A.C.'s injuries were not consistent with him having pulled a pot of water onto himself.

The State also focused on Applicant's lack of emotional response to A.C.'s injuries. Shertzer described Applicant as not grasping the severity of the situation and showing no emotion throughout her interactions with Applicant. On cross-examination, Shertzer admitted that Applicant's apathy could have been a trauma response. Detective Sanchez testified that Applicant did not seem to have an

emotional response when talking about A.C.'s injuries until she began discussing Casiano's alleged rape.

The State also alleged that Applicant failed to get A.C. potentially life-saving medical care by waiting three hours to take him to the hospital. Applicant told detectives that she had taken A.C. to a local non-emergency clinic before taking him to the hospital. The owners of Applicant's duplex, Domingo Diaz and Elisa Romero, testified that Applicant asked Romero for $5 to put gas in Applicant's truck so she could take A.C. to the doctor. Romero testified that she told Applicant to call the hospital or an ambulance and that Applicant declined. Juana Lucas, Applicant's neighbor, accompanied Applicant to the clinic. Applicant told Lucas that she did not want to take A.C. to the hospital because A.C. did not have Medicaid and she believed he would be seen more quickly at a "private doctor." Applicant and Lucas arrived at the clinic during its lunch hour. The doctor at the clinic was Dr. Thieu Bui. Dr. Bui's medical assistant, Kathy Chau, testified that Applicant told Chau that she had a baby with a "small burn" on his head, and that she wanted him to be seen by a private doctor. Chau informed Applicant that the clinic was closed for lunch and that Applicant should take the baby to the emergency room. Dr. Bui testified that he never saw A.C., but when Chau told him that there was a baby with a burn, he told her that their clinic was

not equipped to treat such injuries. Chau relayed this information to Applicant and offered to call an ambulance for Applicant because "the child will die." Applicant said that she would take him to the hospital herself and then went back home to pick up her husband and other children before taking A.C. to St. David's.

Dr. Kerr testified that he would have been able to resuscitate A.C. if he had been brought in to the hospital immediately, but because so much time had lapsed between the injury and the treatment, A.C. suffered "irreversible shock" and fatal organ failure. Dr. Jackson testified that it was "very difficult" to get intravenous access to A.C. to begin circulating fluids, which suggested that A.C.'s burns were more than an hour old. Dr. Jackson also testified that the chances of resuscitating a patient diminish after a delay in receiving treatment. On cross-examination, Dr. Jackson admitted that it was possible Applicant could have arrived at the emergency room earlier than was indicated on the intake paperwork. Carol Morin, an investigator with Child Protective Services assigned to Applicant's case, testified that when she interviewed Applicant at the police station, Applicant told Morin that she knew where and when to take an injured child to the doctor and had done so before with her own children.

In her defense, Applicant presented testimony from her children. None of the children implicated Applicant in the death of A.C. at trial. Jose testified that

A.P. had been in the bathroom with A.C. when A.C. was burned. Jennifer said Jose turned on the water but testified that she remembered previously telling the prosecutor that A.P. put A.C. in the bathtub. A.P. implicated her brother and father at trial but had previously said in interviews that A.C. had burned himself. Applicant also testified in her own defense. Her explanation at trial was that she was in the bedroom nursing her youngest child when Jennifer told her that A.P. was in the bathroom with A.C. Applicant testified that she went into the bathroom, pulled A.C. out of the bathtub, and splashed cold water on him. She testified that she did not go to the hospital immediately or call an ambulance because she did not think A.C. would be seen without insurance. Applicant testified that the true story was that A.P. had put A.C. in the bathtub, and that she lied to investigators and doctors because she was afraid her children would be taken away from her.

In rebuttal, the State recalled Dr. Rene Jankowski to testify about typical child development. Dr. Jankowski testified that none of the other children in Applicant's home, based on typical child development standards, would have been able to hoist A.C. into the bathtub by themselves. Dr. Jankowski testified that the children could have helped hoist A.C. into the tub, but he would have landed in the tub headfirst and would have had some burns to his head and neck area, assuming he was placed in the tub after there was already water in it. On cross-

examination, Dr. Jankowski testified that if there was not water in the tub when A.C. entered it, he may have hit his head on the side of the bathtub.

The jury convicted Applicant as charged in the indictment and sentenced her to three terms of life imprisonment.

### b. Appeal & Applicant's first habeas application

Applicant timely appealed, and the court of appeals affirmed her conviction. On appeal, Applicant argued that the evidence was legally and factually insufficient to support her conviction for injury to a child by omission and that she was denied due process because the State lost exculpatory evidence. The court of appeals affirmed. *Mejia v. State*, No. 03-05-00838-CR, 2008 WL 2219981, at *8 (Tex. App.—Austin May 29, 2008, pet. ref'd) (mem. op., not designated for publication). This Court refused Applicant's petition for discretionary review.

Applicant filed her first application for writ of habeas corpus (the -01 writ) in September 2014. In it, Applicant alleged four grounds. First, she alleged that the State withheld material evidence, namely her children's lost interviews, but also the untaped portion of Applicant's own interview with Detective Sanchez. Applicant claimed that during the untaped portion of the interview, she made an exculpatory statement that A.P. had been responsible for A.C.'s injuries. Second, Applicant claimed that the manner in which she was interviewed violated her

rights to due process and a fair trial, because law enforcement used coercive interview methods by depriving her of sleep and interrogating her for over fourteen hours.

Applicant also alleged that her trial counsel, Edward Carmona, rendered ineffective assistance of counsel. Applicant claimed that Carmona had ongoing personal and legal problems that distracted him from her case, including assault charges against Carmona and his daughter, and a felony DWI charge against Carmona. Applicant argued that because of these personal issues and Carmona's lack of experience, Carmona failed to get a copy of Applicant's interview with law enforcement, failed to investigate and present an expert witness, and failed to procure a translator so that Applicant could understand various pretrial proceedings. Carmona filed an affidavit stating he "did not have the necessary expertise to handle the complexities of this case as it progressed to trial." Diana Salazar, Applicant's second-chair counsel, filed a lengthy affidavit supporting Applicant's ineffective assistance of counsel claims against Carmona and asserting Applicant's actual innocence (though Applicant did not raise a claim of actual innocence in her -01 writ). Applicant also alleged that her appellate counsel was ineffective for failing to argue the voluntariness of Applicant's statement to law enforcement and failing to adequately argue Applicant's lost-evidence claim.

On October 8, 2014, this Court denied Applicant's -01 writ without written order. *Ex parte Mejia*, No. WR-82,126-01 (Tex. Crim. App. Oct. 8, 2014).

### c. The instant habeas application & habeas evidence

Applicant filed the instant -02 application in September 2025. She raises four claims: (1) false testimony; (2) Article 11.073; (3) actual innocence; and (4) ineffective assistance of counsel. The parties agree that Applicant is entitled to relief on all grounds. The habeas court recommends Applicant be granted relief on all grounds. In support of her theory that A.C.'s burns were accidentally inflicted, Applicant presented testimony from key prosecution witnesses at her trial as well as other experts who reviewed medical evidence.

### i. Dr. Keith Kerr

In his affidavit, Dr. Kerr testified that A.C.'s injuries could have been caused accidentally by other children in Applicant's home, contrary to his trial testimony:

> 5. At the time of my trial testimony, I was not aware that [Applicant's] biological daughter [had] taken responsibility for this incident. Given this information, along with the new evidence in the case, it is now my opinion that A.C.'s injuries and ultimate death could have been accidentally caused by the children in this case. The burn patterns in this case are consistent with an accidental immersion burn.

6. I have been asked to provide my opinion regarding whether it is possible that A.C.'s injuries occurred when the children mistakenly turned on the hot water faucet in the bathtub after placing A.C. in the tub. It is my professional medical opinion that the burn patterns present on A.C., coupled with the measured temperature of the water in the bathtub as documented in law enforcement's worksheets, are consistent with this fact pattern. If the children placed A.C. in the tub, then mistakenly turned on the hot water faucet, and left the bathroom to get their mother after A.C. began to exhibit extreme pain, it is possible that A.C. suffered these burns as the scalding water rose. In this scenario, given the extremely hot water temperatures recorded in the tub, A.C. would have suffered full thickness burns in a matter of a few seconds.

Dr. Kerr also reevaluated his opinion as to whether Applicant failed to timely seek medical treatment for A.C. Dr. Kerr testified in his affidavit that the clinic's failure to call an ambulance for A.C. when they had a duty to do so contributed to the delay in care. Contrary to his trial testimony, Dr. Kerr testified that "[g]iven the severity of the burns, the baby's chances of survival were slim."

ii. *Phylip Peltier*

Peltier reviewed affidavits from medical personnel and A.P., the original autopsy report, and temperature charts admitted at trial. In his affidavit and at the habeas hearing, Peltier testified that "[i]t is possible that these injuries could have been caused by another child as long as that child was physically able to reach the hot water faucet and turn on the water." Peltier echoed Dr. Kerr's likely explanation for A.C.'s injuries: that A.C. was placed in the bathtub by the other

children, who then inadvertently turned on the hot water faucet, which was set to extremely high temperatures. He also echoed Dr. Kerr's medical opinion that in this scenario, A.C. would have suffered from full thickness burns in "mere seconds."

### iii.    Dr. Elizabeth Peacock

Applicant also presents Dr. Peacock's reevaluation of her autopsy. Dr. Peacock was unavailable to testify at Applicant's trial, so Dr. Bayardo testified to her conclusions instead. In her affidavit, Dr. Peacock said that she no longer believes A.C.'s death was a homicide:

> 6. When I reached my conclusion regarding the manner of death, I based my conclusions on the investigation and the information that was available to me at the time. I have recently learned that one of [Applicant's] children remembers that the scalding was caused by the children and was an accident and remembers that [Applicant] was not in the bathroom when the baby was burned.
>
> 7. At the time I wrote my report, I was not aware that a law enforcement investigation showed the water temperature from the tap was set at dangerously high levels.
>
> 8. Having had the opportunity to thoroughly review all of the information that is now available, it is my opinion that the manner of death was improperly classified as a homicide, and it is now my opinion that the manner of death should be classified as an accident. It is now my opinion that the totality of the evidence supports the conclusion that the death occurred due to unintentional acts, not child abuse.

Dr. Peacock also discussed the apparent blunt force trauma to A.C.'s head, which Drs. Kerr and Jackson testified to at trial:

> 4. The Medical Examiner's Report that I authored contained a diagram . . . that I created showing the injuries of the child. The autopsy diagram that was entered as part of State's 138—the Medical Examiner's Report testified to by my colleague, Dr. Bayardo—was not created by me and appears to have been created by law enforcement. There were differences between the two diagrams.
>
> 5. My diagram shows multiple splash burns and a contusion on A.C.'s head. The diagram entered into evidence as part of State's 138 indicates that there was blunt force trauma to both sides of A.C.s [sic] head. My diagram does not reflect blunt force trauma to both sides of A.C.'s head.
>
> * * *
>
> 8. . . In my autopsy I noted a contusion to the scalp that was characterized in the death certificate as blunt force trauma. It is now my opinion that the cause of the contusion is undetermined. It is unlikely that the injury contributed to the child's death.

### iv.    Dr. Wendy Shields

Dr. Shields is a Senior Scientist at Johns Hopkins School of Health and focuses her research on prevention of scald injuries. In conducting her analysis, Dr. Shields reviewed A.C.'s injuries and medical reports as well as temperature charts admitted at trial. Dr. Shields concluded that the water heater in Applicant's building was set to an unsafe temperature and that there was no scald protection in the faucets. She also discussed other cases she had encountered during her

research in which children had sustained injuries similar to A.C.'s under "similar circumstances of A.C.'s injury." Based on these observations, Dr. Shields opined that "the primary causes of A.C.'s injury were the failure to 1. Properly set the water heater to a safe temperature and 2. The failure to utilize temperature limiting valves to control the temperature in the bathtub as recommended by the manufacturers."

Further, Dr. Shields discussed common factors that are likely to have contributed to the delay in A.C.'s care. According to her research, "it is common for burn victims to receive inadequate first aid treatment." It is also common for caretakers to turn to friends or family for guidance on their children's injuries, especially for burn injuries about which research has shown parents lack knowledge. Finally, Dr. Shields noted that parents tend to supervise their children in relation to known risks, and that "low income and immigrant families often lack awareness of typical home injury risks."

### v. Dr. James Gallagher

Dr. Gallagher was retained to conduct a review of the medical evidence surrounding A.C.'s death. Dr. Gallagher reviewed the trial testimonies of all medical professionals who treated A.C. as well as the testimonies of Applicant's children. Dr. Gallagher also reviewed A.C.'s autopsy and medical records and law

enforcement investigation materials. Dr. Gallagher noted that A.C. would have sustained his injuries within "mere seconds" of the faucet being turned on.

Dr. Gallagher also described the likely scenario based on A.C.'s injuries:

Although the initial angle of [A.C.'s body] entering the water cannot be determined with certainty, the majority of his body entered and remained in the water at an oblique angle, with the child prone with chest and head lifted or held up out of the water. In the water, the child was tilted with his left side lower than the right: the child's belly was burned along with his arms, and legs while the head, upper chest, back, and buttocks are more spared.

Contrary to Dr. Kerr's and Peltier's trial testimonies, Dr. Gallagher could "find no clear evidence of the child being held down in the water." Dr. Gallagher also noted that Dr. Kerr's explanation at trial that A.C. was held down in the water by his back was inconsistent with A.C.'s injuries. If that had been the case, A.C.'s stomach would have been pressed against the bottom of the tub and less burned than it actually was. Dr. Gallagher testified that Dr. Kerr's inference at trial that the sparing under A.C.'s armpits meant he was held under the arms was not an inference that "can be made from this physical finding." Dr. Gallagher also testified that "[t]here is no way to determine with certainty based on the appearance of [A.C.'s] burn injuries whether his injuries were the result of a deliberate or accidental immersion burn in the bathtub." Dr. Gallagher concluded

that "[b]ased on my training, experience, and the medical evidence, the injuries suffered by [A.C.] are consistent with an accidental or unintentional burn."

Dr. Gallagher also testified to A.C.'s apparent head contusions and said that Dr. Kerr's conclusion that A.C. suffered blunt force trauma to his head likely influenced her conclusion that A.C.'s burns were intentionally inflicted. However, Dr. Gallagher noted there was no evidence to attribute A.C.'s head injuries to blunt force trauma. Dr. Gallagher's opinion was that "the mark on [A.C.'s] head characterized as a bruise may be a first-degree burn."

As to whether Applicant acted reasonably in seeking medical treatment for A.C., Dr. Gallagher testified that the immediate effects of burns like the ones A.C. suffered would have been internal, so it would not have been readily apparent to Applicant that A.C. was "nearing death." He also testified that, in his opinion, Applicant took reasonable steps to get A.C. medical treatment, particularly in light of her beliefs about health care access and A.C.'s lack of documentation. Finally, Dr. Gallagher disagreed with Dr. Kerr's statement at trial that A.C. would have lived if A.C. had been brought to the hospital immediately:

> The severity and extent of the burns that [A.C.] suffered made his injuries life threatening with little hope of survival and death the most probable outcome. Even if he had been taken to an emergency room immediately following the injuries and had been able to be transported to one of the world's devoted children's burn centers, it

is far more likely that he would have died. The burn injuries here carry an approximate 20% chance of survival.

vi.    *A.P.'s Affidavit*

Applicant also presented non-scientific testimony from her daughter A.P. who signed an affidavit. It reads, in its entirety:

> When I was about three years old, I remember being in a bathroom with my older brother, younger sister, and a baby. I thought the baby was a cousin or visitor. My younger sister, M—, was not in the bathroom. My birth mother, Carmen Mejia, was not in the bathroom.
>
> I don't know how the baby got in the bathtub. I do remember turning on the water. Almost right after I turned on the hot water, the baby started screaming. I didn't know what to do and I ran and got my birth mother. I remember that the baby was very red and wouldn't stop screaming but I don't remember much after that.
>
> I don't remember testifying at the trial or talking to investigators. I thought my birth mother was in prison for being the adult in the house when the baby was burned.
>
> After the baby died, I lived with my siblings and birth father. I remember that he abused me and I still have a scar from him hitting me. I remember going to the hospital and then I didn't see him again.
>
> When I was about 16, I told my adopted mother that I remember turning on the faucet. That is when she told me more information about my birth mother.
>
> I have talked about turning on the faucet with my siblings. When I was a teenager, I went to therapy in New Braunfels. During a one-on-one session I told the therapist I remembered turning on the faucet.

> I did not know everything about the case until the summer of 2024 when prosecutors from the Travis County District Attorney's Office reached out to my siblings to ask about the case.

> On August 21, 2024 I met with Jenna Fechner, Vanessa Potkin, Trudy Strassburger, Brenda Cachy Gutierrez at the St. Mary's Law School Law Library. I brough [sic] my sister, M— with me.

During the habeas hearing, A.P. testified that she did not "know if it was my brother who had put [A.C.] in [the bathtub] or if he and him had help." A.P. clarified that A.C. was already in the bathtub when she (A.P.) turned on the faucet, and that A.C. began crying "pretty instantly" when the water began running. A.P. testified that after A.C. began crying, she went to go find Applicant elsewhere in the house. A.P. could not testify with certainty where Applicant was in the house—A.P. said that Applicant was either in the kitchen cooking or "she was in her bedroom or a bedroom"—just that Applicant was not in the bathroom at the time. When questioned by the habeas court, A.P. testified that she did not remember much of what happened after she went to get Applicant; all she remembered was turning the water on. A.P. also testified that she had no memory of the police investigation that followed. The habeas court found "A.P's poignant testimony to be 'extremely credible.'" Applicant also presented CPS records during the habeas hearing. The habeas court ultimately found that "Applicant's trial was infected with constitutional error, that scientific evidence relied on by the

State at Applicant's trial has now been contradicted by relevant scientific evidence, and that Applicant is innocent of the crimes for which she was convicted and has been imprisoned for the past 22 years." As to Applicant's Article 11.073 claim, the habeas court specifically found:

> [T]he new scientific evidence relates to a central issue at trial — whether A.C.'s injuries resulted from an accident as Applicant maintained or whether Applicant intentionally held A.C. down in scalding water and delayed care to cover her abuse as the State mentioned. Dr. Peacock's conclusion that A.C.'s manner of death was homicide carried enormous weight with the jury and under the particular circumstances of this case equated with a guilty verdict.

The habeas court also found that had Dr. Peacock's revised opinion regarding A.C.'s cause of death been admitted at Applicant's trial, the jury more likely than not would not have convicted Applicant, especially given that "Dr. Peacock now definitively finds that the manner of death was accidental."

## II. Actual Innocence

### a. Applicable Law

An applicant can obtain relief on the basis that she is actually innocent of the crime for which she was convicted in light of newly discovered evidence. *Elizondo*, 947 S.W.2d at 205. When asserting such a claim, an applicant must prove *by clear and convincing evidence* that no reasonable juror would have convicted her based on the newly discovered evidence. *Id.* at 210. This is a "herculean" burden.

*Brown*, 205 S.W.3d at 545. Newly discovered evidence is that which "was not known to the applicant at the time of trial, plea, or post-trial motions and could not be known to him even with the exercise of due diligence." *Ex parte Chaney*, 563 S.W.3d 239, 274 (Tex. Crim. App. 2018); *see also* TEX. CODE CRIM. PROC. art. 11.07, § 4(c). An applicant may rely on a single piece or multiple pieces of new evidence so long as the burden of proof is met, and the newly discovered evidence must affirmatively support the applicant's innocence. *Id.* To determine whether an applicant has met that burden, the court must weigh the newly discovered evidence against the State's case at trial to determine the probable impact the evidence would have had at trial if it had been available. *Elizondo*, 947 S.W.2d at 206.

### b. Applicant's *Elizondo* claim is barred under Article 11.07, Section 4

Applicant contends that newly discovered evidence demonstrates that she is actually innocent of the crimes for which she was convicted. Specifically, Applicant's "newly discovered evidence" includes (1) A.P.'s 2024 affidavit and habeas testimony that A.P. turned on the hot water that burned A.C. while Applicant was absent; (2) Dr. Peacock's 2024 revised opinion that the manner of death was "accidental"; and (3) new affidavits from the State's trial expert

witnesses, Dr. Kerr and Peltier, stating that A.C.'s injuries could now be consistent with an accident.

Applicant's *Elizondo* claim fails because A.P.'s 2024 affidavit, which serves as the basis for the revised medical opinions, is not "newly discovered evidence." During Applicant's case-in-chief, she elicited testimony from her children Jose and Jennifer that A.P. was in the bathroom at the time A.C. sustained his injuries. Jose testified:

> Q:  I know it is hard to remember back, but do you remember the baby that lived there?
>
> A:  (Nods affirmatively.)
>
> Q:  At the house at the time. And do you remember what happened to him?
>
> A:  He got burned in the bathtub.
>
> Q:  He got burned in the bathtub, uh-huh. And did that scare you?
>
> A:  Kind of. Because I was like six or something.
>
> Q:  Yeah. It was kind of scary, huh?
>
> A:  (Nods affirmatively.)
>
> Q:  And do you remember who was in the bathroom at the time when he first—
>
> A:  It was probably Ana.
>
> Q:  It was [A.P.]?

A:     That is who I saw in the bathroom.

\* \* \*

Q:     Do you remember if anyone else was in the bathroom when he first got burned?

A:     (Shakes head negatively.)

\* \* \*

Q:     Where were you when—

A:     I was in bed watching TV.

Q:     You were watching TV, and how did you first figure out that the baby had been burned?

A:     When I heard him cry.

Q:     Heard him crying?

A:     And my sister came over and told me.

Q:     Your sister came over and told you?

A:     (Nods affirmatively.)

Q:     And what did you do next? Do you remember?

A:     I woke up my mom, try to wake her up, and I couldn't, and I finally woke her up.

Q:     You woke up your mother?

A:     Yeah and she called my dad.

Q:     And she called your dad. And where was she at?

A:      Bed sleeping.

Jennifer testified:

Q:      Do you remember who was in the bathroom with the baby when he got burned?

A:      (Nods affirmatively.) Yes.

Q:      Who was that?

A:      Ana.

Q:      Ana? And when you came before and you met with [the prosecutor], do you remember talking to her?

A:      (Nods affirmatively.)

* * *

Q:      Do you remember telling her that [A.P.] put hot water on the baby?

A:      (Nods affirmatively.)

Q:      That is a yes?

A:      (Nods affirmatively.)

Applicant also presented testimony from Alia Alsaffar, a representative of Child Protective Services:

Q:      Have you had an opportunity to review the summaries of an interview that you did with — well, did you interview [A.P.] that day?

A:      On July 29th?

Q:     Yes.

A:     Yes.

Q:     Have you had an opportunity to review your summaries of that interview?

A:     Yes

* * *

Q:     . . . do you remember asking Patti if anyone had been hurt recently?

A:     Yes, I did ask her that.

Q:     Okay. And do you remember asking Patti who took the baby to the hospital?

A:     Yes.

Q:     And how did she reply?

A:     She replied Carmen.

Q:     Do you remember asking whether Carmen was her mother?

A:     Yes, I asked her to identify who that was.

Q:     She did say that it was her mother?

A:     Yes.

Q:     Do you remember asking her — do you remember her reaction when you asked her what happened to the baby?

A:     Yes, I do.

Q:     And what was that?

A:     According to my notes, I had documented that soon after asking what had happened to the baby, Patti shut down and rolled up into a fetal position on the cushion. When I tried to ask her again what had happened, she did not respond.

*  *  *

Q:     What was her demeanor at that point?

A:     She was pretty shut down in that she wasn't responding, and she was having a physical reaction by curling up in a fetal position.

Q:     Okay. Did she then tell you that the baby was burned?

A:     Yes. After much delay, she then responded by telling me the baby was burned.

Q:     Do you remember asking her who had burned the baby?

A:     Yes.

Q:     And did she then explain to you that he burned himself?

A:     Yes.

Q:     Do you remember asking her where the baby was when it was burned?

A:     Yes.

Q:     And can you tell the jury her response to that?

A:     She told me that he was in the bathroom at their house when he was burned.

Q:     And do you remember asking her who was in the bathroom when this happened?

A:     Yes.

Q:     And what did she say to that?

A:     She said that her younger sister Jenny was in the bathroom as well as Kiki, or — that is what they called Jose — was in the bathroom.

Applicant also presented testimony from Cindy Cantu, another representative of

Child Protective Services, who testified about an interview she conducted of Jose:

Q:     Do you remember asking Jose Enrique about the day July 28, 2003 when a baby was injured at his home?

A:     I know that I asked him about the baby being injured, but we didn't speak of a specific day.

Q:     Okay. Do you remember his age at the time?

A:     Jose's age was eight. He told me he was eight.

Q:     Do you remember him being uncomfortable in the beginning?

A:     He was very uncomfortable throughout the interview.

Q:     Do you remember him even going underneath a chair at one point, not wanting to talk about it?

A:     Yes.

Q:     Do you remember that he initially — I'm sorry, do you remember asking him about the baby being burned?

A:     Yes.

Q: Okay. And do you remember asking him who was with the baby when he got burned?

A: Yes.

Q: Do you remember what he said in response to that?

A: He gave a lot of different answers, but primarily I think he said that he did not know, that he saw the baby in the bathtub alone.

Q: You don't remember him saying that [A.P.] was trying to — and there is an inaudible portion, and to do something to the baby?

A: No, I don't remember that.

Q: Do you remember him saying that he was trying to bathe the baby?

A: That he was trying to bathe the baby?

Q: Uh-huh.

A: No, I don't remember that.

Q: Did you just watch that this morning?

A: Yes.

Q: Do you remember asking him where as [A.P.] at the time?

A: Yes.

Q: And do you remember him saying I think in the shower?

A: He gave a couple of different answers to that, and one of those was in the shower, and then right after that, he said he didn't know, and then later in the interview, he said that she — the

other — she and his sisters were in the kitchen eating breakfast.

Q:    And do you have — having reviewed the entire 50-minute video, did you notice whether at any time he said that Ms. Mejia, his mother, burned the baby?

A:    He never said that.

Q:    Do you remember him saying that he tried to pick the baby up after he was burned?

A:    Yes.

Q:    Do you remember him saying that he called his mother to the bathroom after the baby was burned?

A:    Yes.

Q:    Do you remember him saying that his mother called his dad right away after that?

A:    Yes.

Q:    And do you remember him saying that his dad got there right after?

A:    He didn't say specifically when his dad got there, but just that his dad did show up.

Q:    And do you remember asking where his mother was at that time when the baby was injured?

A:    I asked him where the — where his mother was when he saw the baby in the bathtub, and he said that his mother was in the bedroom.

Q: Okay. Do you remember a discussion toward the end of the interview about how he — where he actually told you he sometimes had tried to bathe the baby but he knows the difference between hot and cold water?

A: Yes.

Q: And at the very, very end when the interview ends, do you remember that he was telling you specifically without you asking something to the effect that may it was one of the little girls because they don't know. Do you remember that?

A: May I refer to my notes?

Q: Yes.

A: Yes, I think he did say that.

This testimony was compounded by Applicant's trial counsel's arguments to the jury. During opening statements, Applicant's trial counsel argued that "what happened to [A.C.] was a tragic accident" that "happened when Ms. Mejia wasn't even in the bathroom . . . where [A.C.] was burned," but "her children were present. Maybe not all of them, but some of them were present in that bathroom."

In closing arguments, trial counsel again emphasized "this horrible tragedy." Counsel then argued:

> The State would like you to believe that this whole injury, it is all Carmen's fault, but I am asking you to recall the evidence that you heard about all the chaos and the confusion of this morning.

> We are not playing the blame game here, [A.P.] did it, it would have been Jose. There were four very active young children at home at the time that this injury happened. It could have been one of them. These children are too young to be capable of this kind of evil. It was an accident. Accidents happen.

Counsel later reminded the jury of Applicant's interview with law enforcement, emphasizing: "[S]he discovered the baby was burned. She never said [A.P.] did it. She said she walked in and found [A.P.] there by the baby in the tub. No one is calling [A.P.] a killer. She is too young. Kids have accidents."

Even assuming these portions of argument and testimony are not sufficient to show that Applicant—and her trial counsel—were aware of the evidence implicating A.P. at the time of Applicant's trial, the record clearly shows that Applicant's trial counsel had in his possession the summaries of the CPS interviews. In fact, Applicant's trial counsel *unsuccessfully moved to admit those summaries as evidence*:

| | |
|---|---|
| [Trial Counsel]: | I wanted to move at this time to enter the summaries of the children's statements from 2003. |
| [The Court]: | For — |
| [Trial Counsel]: | I thought — I am moving to admit Defense 1, the children's summaries. |
| [The Court]: | For what purpose? Is the State objecting? |

| | |
|---|---|
| [The State]: | Yes. Just like we — yes, we do. They are hearsay. They need to call the witness. |
| [The Court]: | No further argument, just asking me to admit? |
| [Trial Counsel]: | Yes, Judge. They are part of what he has reviewed, and he has had the State's other reports and information provided to him, so this should be included as well. |
| [The Court]: | Under rule 705, 705(d), specifically, of the rules of evidence, I am going to deny your request. Sustain the objection. |

And even if that is not sufficient, it is hard to credibly imagine that "through the exercise of reasonable diligence," TEX. CODE CRIM. PROC. art. 11.07, § 4(c), trial counsel could not have acquired copies of the actual notes taken during the CPS interviews that were later admitted at Applicant's habeas hearing.

Additionally, the factual basis for Applicant's actual innocence claim was known to Applicant at the time of her -01 writ. Part of Applicant's ineffective assistance of counsel claim in her -01 writ alleged that Carmona, her trial counsel, was ineffective for failing to request exculpatory video statements of the child witnesses from law enforcement until after they were lost. According to Applicant, the video statements would have corroborated Applicant's defense that A.P. caused A.C.'s injuries. This further shows that A.P.'s admission is not "newly

discovered evidence" because Applicant knew of it not only at the time of trial but also at the time of her first habeas application.

Moreover, the revised medical opinions are also not "newly discovered evidence" because they are each predicated on A.P.'s 2024 affidavit—which *itself is not newly discovered.* In her affidavit, Dr. Peacock states that "it is my opinion that the manner of death was improperly classified as homicide, and it is now my opinion that the manner of death should be classified as accident." But Dr. Peacock readily admits that she has "recently learned that one of [Applicant]'s children remembers that the scalding was caused by the children and was an accident and remembers that [Applicant] was not in the bathroom when the baby was burned." The problem with that assertion, as the record makes clear, is that that evidence *was known by both Applicant and the State* at the time of Applicant's trial.[2] Similarly, the affidavits by both Peltier and Dr. Kerr relay that they reviewed A.P.'s 2024 affidavit and now conclude that A.C.'s injuries could have been caused accidentally. Dr. Kerr specifically states that "[a]t the time of [his] trial

---

[2] The same is also true about Dr. Peacock's assertion that she "was not aware that a law enforcement investigation showed the water temperature from the tap was set at dangerously high levels." As the trial record shows, Detective Merrill testified that he and Detective Sanchez had conducted a water test and that the hot water heater in the bathroom was set between 140 to 150 degrees, and the water heated to 147.8 degrees at the "top end." This evidence was known to Applicant and the State at the time of Applicant's trial.

testimony, [he] was not aware that [Applicant's] biological daughter [had] taken responsibility for this incident. Given this information, along with the new evidence in the case, it is now my opinion that A.C.'s injuries and ultimate death could have been accidentally caused by the children in this case." Yet, Applicant's trial counsel knew at the time of Peltier's and Dr. Kerr's testimony of the children's conflicting statements that pointed to A.P.[3]

This Court's precedent sets a demanding standard. Applicant is raising a *Herrera* claim—"a 'bare claim of innocence' based solely on newly discovered evidence." *Brown*, 205 S.W.3d at 544 (discussing *Herrera v. Collins*, 506 U.S. 390 (1993)). As we explained in *Brown*, "'newly discovered evidence' refers to evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence. He cannot rely upon evidence or facts that were available at the time of his trial, plea, or post-trial motions, such as a motion for new trial." *Id.* at 545. In *Brown*, we held that a recantation of sexual assault was not "newly discovered evidence" because the

---

[3] Applicant's trial counsel did cross-examine Dr. Kerr on several occasions to test Dr. Kerr's conclusion that the burn injuries were not consistent with an "accidental" cause.

affidavit recanting the sexual assault was identical to the affidavit attached to the applicant's motion for new trial. *Id.* at 547.[4]

Based on the record before us, as well as the applicable law, the factual basis for Applicant's actual innocence claim was available at the time of Applicant's trial and at the time of Applicant's initial habeas application. Consequently, Applicant's actual innocence claim is barred. *See* TEX. CODE CRIM. PROC. art. 11.07, § 4(c).[5]

### c. Applicant's *Elizondo* claim fails on the merits

Even if this Court were to consider the merits of Applicant's *Elizondo* claim, Applicant fails to meet *Elizondo*'s "herculean burden" for two primary reasons. First, as detailed previously, the basis for Applicant's *Elizondo* claim was *already*

---

[4] *See also Ex parte Briggs*, 187 S.W.3d 458, 465 (Tex. Crim. App. 2005) (concluding that applicant's *Herrera* claim failed in part because the evidence of the victim's extensive history of medical ailments was "available at the time this case was set for trial.").

[5] Applicant's false evidence claim fails for the same reasons. The factual basis for that claim— that the State presented false evidence in the form of medical evidence to support the State's theory that the burns could not have been accidentally caused—*was* available at the time of Applicant's trial. In fact, as the record *supra* shows, Applicant's trial counsel both argued this point to the jury and admitted evidence to support it.

To the extent that the innocence gateway exception may apply, Applicant fails to show innocence under the innocence gateway provisions. *See Ex Parte Reed*, 670 S.W.3d 689, 745 ("We have construed this language [innocence-gateway exception under TEX. CODE CRIM. PROC. 11.071, § 5(a)(2)] as a 'codification of the Supreme Court's *Schlup v. Delo* standard' . . . . Importantly, even in the *Schlup* context, 'actual innocence means factual innocence, not mere legal insufficiency.'"). The same is equally true for Applicant's ineffective assistance of counsel claim.

*presented to the jury* and the jury rejected that defense. The fact that the evidence is not newly discovered since Applicant's trial is the very reason why Applicant's *Elizondo* claim is defeated on its merits. Second, the expert testimony presented by Applicant in the habeas hearing lacks the level of certainty necessary to rule out homicide as the cause of A.C.'s death.

The lynchpin of Applicant's *Elizondo* claim is A.P.'s allegedly new admission that she caused A.C.'s burns. Fundamentally, for Applicant's *Elizondo* claim to be successful, a jury would have to believe A.P. that Applicant had no involvement in A.C.'s burning and consequently find Applicant not guilty. The problem with this logic is that this very defense was already presented at Applicant's original trial. As detailed previously, Applicant's defense involved calling her children—A.P., Jennifer, and Jose—to testify about what happened to A.C. Applicant also introduced evidence from two CPS employees who testified about interviews with the children after Applicant's arrest. The children uniformly testified (and told the CPS employees) that Applicant was not involved in A.C.'s burning. In fact, several children testified that Applicant was not even in the bathroom at the time A.C. was burned. This was also a central theme of Applicant's closing argument to the jury. Applicant's trial counsel argued that "[i]t was an accident" and "[a]ccidents happen," and that "[i]t could have been

one of [the children]." The jury rejected this defense and convicted Applicant on all counts. It is difficult to imagine that a different result would be reached today should Applicant present the same defense again at trial.

To the extent that the "new" medical opinions could be the basis for a successful *Elizondo* claim, that argument is unpersuasive. As detailed later in part III, Applicant's new medical testimony forms the basis for a meritorious Article 11.073 claim. However, for the same reasons that the testimony suffices for the purposes of Article 11.073, the testimony fails to suffice for *Elizondo*.

Applicant's medical experts now agree that the evidence "could"—and I emphasize "could"—be consistent with an accidental cause. Dr. Kerr testified that A.C.'s injuries could have been caused accidentally by the other children in Applicant's home. In his affidavit, Dr. Kerr stated: "it is now my opinion that A.C.'s injuries and ultimate death *could have been* accidentally caused by the children in this case. The burn patterns in this case are consistent with an accidental immersion burn." (Emphasis added). In his affidavit and at the habeas hearing, Peltier testified that "[i]t is possible that these injuries *could have been* caused by another child as long as that child was physically able to reach the hot water faucet and turn on the water." (Emphasis added).

This testimony is problematic for Applicant's *Elizondo* claim for several reasons. First, the medical experts themselves do not foreclose intentional conduct as the cause of A.C.'s injuries. Second, a jury "could" disbelieve Applicant's medical experts and nevertheless find that A.C.'s injuries were caused by intentional conduct. Third, a jury that did not believe A.P. would certainly reject the changed medical expert opinions that rely on A.P.'s allegedly new admission in her affidavit.

In any event, Applicant fails to meet *Elizondo*'s by clear and convincing evidence burden.[6] Even if this Court were to consider the merits of Applicant's *Elizondo* claim, the claim fails.

---

[6] Consider the cases in which we have granted *Elizondo* relief, just to name a few. In *Ex parte Cobb*, 710 S.W.3d 747, 760 (Tex. Crim. App. 2025), DNA evidence conclusively excluded the applicant as a donor from a cup that the robber drank from and disposed at the scene of the crime. In *Ex parte Cook*, 691 S.W.3d 532 (Tex. Crim. App. 2024), among many other pieces of evidence that undermined the confidence in the applicant's verdict was conclusive DNA evidence that excluded the applicant as a donor of a blood stain on the victim's bra and semen on the victim's panties. In *Ex parte Reyos*, No. WR-28,073-02, 2023 WL 6458560 (Tex. Crim. App. Oct. 4, 2023), new fingerprint evidence conclusively excluded the applicant as the donor of fingerprints in the victim's hotel room, vehicle, and credit card. In *Ex parte Santillan*, No. WR-49,763-02, 2023 WL 2150874 (Tex. Crim. App. 2023), DNA evidence conclusively excluded the applicant as the donor of DNA on a jersey worn by the perpetrator of the offense.

The arduous *Elizondo* standard is clear: "The applicant must do more than merely raise doubts about his guilt—he must produce affirmative evidence of innocence." *Cook*, 691 S.W.3d at 561 (quoting *Ex parte Reed*, 670 S.W.3d 689 (Tex. Crim. App. 2023)) (internal quotation marks omitted). Applicant certainly has raised doubts about her guilt. In fact, as I explain later, she has sufficiently met the Article 11.073 standard to be entitled to habeas relief. She simply has not met the high bar for relief on her *Elizondo* claim.

### d. This Court should stop using the actual innocence label

In any event, this Court errs to label Applicant "actually innocent." I agree with JUDGE YEARY that this Court should not be in the business of labeling successful *Elizondo* applicants in that manner. *See, e.g.*, *Ex parte Cobb*, 710 S.W.3d 747, 760 (Tex. Crim. App. 2025) (YEARY, J., concurring); *Ex parte Warfield*, 618 S.W.3d 69, 74 (Tex. Crim. App. 2021) (YEARY, J., concurring); *Chaney*, 563 S.W.3d at 286 (YEARY, J., concurring); *Ex parte Cacy*, 543 S.W.3d 802, 804 (Tex. Crim. App. 2016) (YEARY, J., concurring).

In *Cacy*, JUDGE YEARY wrote:

> The *Elizondo* standard, on its face, does not really focus on innocence per se. It is, instead, an exceedingly high burden by which an applicant must show that, if newly available evidence were added to the evidentiary mix, no reasonable jury would have found the State's case to have been compelling enough to defeat the systemic presumption of innocence. Simply put, the State would not have been able to prove him guilty beyond a reasonable doubt, and a reasonable jury would be obliged to declare him not guilty. This is not the same as establishing that the applicant is manifestly innocent.

543 S.W.3d at 803 (YEARY, J., concurring). I agree with JUDGE YEARY's bottom line: "I would avoid the label of actual innocence—at least in the absence of evidence that conclusively proves, not just that a reasonable jury, by clear and convincing evidence, would not have convicted him, but that the applicant manifestly did not commit the offense." *Id.* at 804.

To be clear, I am not advocating that we make the "herculean" *Elizondo* standard more arduous. *Cf. Cobb*, 710 S.W.3d at 749–50 (RICHARDSON, J., concurring) ("Despite that, in an unsolicited crusade now lasting almost a decade, a member of this Court continues to advocate that the *Elizondo* standard is not rigorous enough to identify the 'actually innocent' from the hundreds of non-meritorious cases this Court has received."). Nor do I imagine that JUDGE YEARY is in fact advocating for such a change in our habeas jurisprudence. *Id.* at 760 (YEARY, J., concurring) ("Note that each of these was a *concurring* opinion. I have no qualms about granting post-conviction habeas corpus relief to any applicant who can satisfy the current *Elizondo* standard.") (original emphasis); *Warfield*, 618 S.W.3d at 74 (YEARY, J., concurring) ("I would also grant relief to any post-conviction applicant who can satisfy the *Elizondo* standard. But I would not necessarily call that applicant 'actually innocent' in doing so."). I just happen to believe that this Court should avoid the "term of art" that is the "actually innocent" label. *Cf. In re Allen*, 366 S.W.3d at 706 ("'Actual innocence' is a legal term of art, which has acquired a technical meaning in the habeas corpus context.").[7]

---

[7] In fact, the solution is quite a simple one. The Court's *per curiam* order states: "We agree that Applicant has established that she is actually innocent." *Ante* at 2. The order then states: "Relief

### III.    Article 11.073[8]

In her Article 11.073 claim, Applicant argues that she is entitled to habeas relief because new scientific evidence—Dr. Peacock's re-evaluation and conclusion that A.C.'s death was accidental—contradicts scientific evidence relied on by the State at trial: Dr. Peacock's initial conclusion that the death was a homicide.

### a.  Applicable Law

Article 11.073 of the Code of Criminal Procedure provides:

(a) This article applies to relevant scientific evidence that:

> (1) was not available to be offered by a convicted person at the convicted person's trial; or

> (2) contradicts scientific evidence relied on by the state at trial.

(b) A court may grant a convicted person relief on an application for a writ of habeas corpus if:

> (1) the convicted person files an application, in the manner provided by Article 11.07, 11.071, or 11.072, containing specific facts indicating that:

---

is granted." *Id.* (citing *Elizondo*). The Court could simply delete the first sentence and limit its order to only what it believes is necessary: "Relief is granted." That being said, this Court errs to grant relief on Applicant's actual innocence claim in the first place.

[8] I do not discuss Applicant's ineffective assistance of counsel claim because that claim is also barred. *See* TEX. CODE CRIM. PROC. art. 11.07, § 4(a). A nearly-identical version of this claim was raised in Applicant's initial habeas application which this Court denied. *See Ex parte Mejia*, No. WR-82,126-01 (Tex. Crim. App. Oct. 8, 2014).

> (A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and
>
> (B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and
>
> (2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.

TEX. CODE CRIM. PROC. art. 11.073(a)–(b). Article 11.073 also includes its own

writ bar. Subsection (c) provides:

> For purposes of Section 4(a)(1), Article 11.07, . . . a claim or issue could not have been presented previously in an original application or in a previously considered application if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application or a previously considered application, as applicable, was filed.

*Id.* art. 11.073(c). To make this determination, we consider:

> [W]hether the field of scientific knowledge, a testifying expert's scientific knowledge, or a scientific method on which the relevant scientific evidence is based has changed since:
>
> > (1) the applicable trial date or dates, for a determination made with respect to an original application; or

> (2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

*Id*. art. 11.073(d).

"Scientific method is defined as '[t]he process of generating hypotheses and testing them through experimentation, publication, and republication.'" *Ex parte Robbins*, 478 S.W.3d at 691. "'Scientific knowledge' includes a change in the body of science (e.g., the field has been discredited or evolved) and when an expert's opinion changes due to a change in their scientific knowledge (e.g., an expert who, upon further study and acquisition of additional scientific knowledge, would have given a different opinion at trial)." *Chaney*, 563 S.W.3d at 255.

### b. Evidence

The crux of Applicant's new science evidence is Dr. Peacock's change of opinion since Applicant's trial. At trial, Dr. Bayardo testified to Dr. Peacock's conclusion that the initial manner of death was homicide and that that conclusion was based on the "anatomic findings" of the autopsy performed on A.C. "and investigation information available to [Dr. Peacock] at the time." In an affidavit executed October 3, 2024, Dr. Peacock now avers:

> Having had the opportunity to thoroughly review all of the information that is now available, it is my opinion that the manner of death was improperly classified as homicide, and it is now my opinion

that the totality of the evidence supports the conclusion that the death occurred due to unintentional acts, not child abuse.

To reach this new conclusion, Dr. Peacock re-evaluated the following materials:

> [1] the transcript of the 2005 testimony of my colleague; [2] the complete Medical Examiner file in this case including the report; [3] photos, x-rays, and diagrams; [4] State's Exhibit 138; [4] a sworn 2024 affidavit by A.P., the Applicant/Defendant's daughter; and [5] worksheets detailing law enforcement's investigation of the water temperature at the location.

Dr. Peacock also considered Dr. Gallagher's report regarding A.C.'s burn injuries and "believe[d] that the conclusions in Dr. Gallagher's report are medically valid opinions." Dr. Peacock emphasizes that she "based [her] conclusions on the investigation and the information that was available to [her] at the time," and she only "recently learned" of A.P.'s admissions and "was not aware that a law enforcement investigation showed the water temperature tap was set at dangerously high levels." Dr. Peacock further emphasized:

> In my autopsy I noted a contusion to the scalp that was characterized in the death certificate as blunt force trauma. It is now my opinion that the cause of the contusion is undetermined. It is unlikely that the injury contributed to the child's death.

During the habeas hearing, Dr. Peacock testified that she changed her opinion on the case because of "the affidavit from the now adult young woman who was with the child at the time," referring to A.P.'s new affidavit. Addressing the State's

theory at trial that Applicant's delay in seeking medical care was intentional, Dr. Peacock further opined that it was likely A.C. would have died from his injuries anyways, even with timely medical intervention.

### c. Discussion

#### i. *The writ bar*

The preliminary question is whether Applicant's Article 11.073 claim survives the writ bar. The revised expert opinions satisfy the requirements of Article 11.073(c) of the Code of Criminal Procedure under *Robbins*. In *Robbins*, we observed:

> The State argues Moore's re-evaluated opinion was available at trial because the same information was presented by the defense through Dr. Bux. We disagree. The relevant evidence is the State's evidence on Tristen's cause of death. It has changed. Moore's re-evaluated opinion on cause of death contradicts the evidence relied on by the State at trial and was not available at that time because she re-evaluated years after the trial ended.

478 S.W.3d at 692. Two observations about *Robbins* are also important. First, *Robbins* was a subsequent writ. *See id.* at 689. Second, unlike an Article 11.073 claim that presents new DNA results or new testing, the expert in *Robbins* simply "re-evaluated her testimony and opinion and [could] no longer stand by her trial testimony." *Id.* at 690.

*Robbins* remains good law. As in *Robbins*, the revised medical opinions here

are based on the experts' reevaluations of their trial testimonies such that each expert could no longer stand by their original trial testimony. Consequently, the revised medical opinions here, which are nearly identical in form to those in *Robbins*, satisfy the requirements of Article 11.073(d).

### ii. Merits

In *Robbins*, we held that the revised expert opinion as to the cause of death "satisfies the requirements to be called 'scientific knowledge,' and thus falls within the language of article 11.073." 478 S.W.3d at 692. We further held that the revised opinion "was not available at the time of trial because her scientific knowledge has changed since the applicable trial date." *Id.* We emphasized that the expert's "original trial testimony was the only evidence presented claiming conclusively that [the complainant] died as the result of a homicide . . . [and t]he State also emphasized [the expert's] testimony in its closing statement when arguing to the jury that the applicant caused [the complainant's] death" *Id.* Consequently, we found that "on the preponderance of the evidence that, had this evidence been presented at trial, the applicant would not have been convicted," because "[i]t is hard to imagine any reasonable jury's returning a conviction when no one can even say confidently that a murder has been committed." *Id.*

The same is likewise true here. Every single expert that testified at

Applicant's trial uniformly refuted Applicant's accidental injury defense. Yet, now, several of those experts cannot conclusively say—as they originally did at Applicant's trial—that A.C.'s death was a result of intentional homicide. As in *Robbins*, "[i]t is hard to imagine any reasonable jury's returning a conviction when no one can even say confidently that a murder has been committed." *Id.*

## IV. Conclusion

I concur in the Court's order vacating Applicant's judgment of conviction and remanding Applicant to the custody of the Sheriff of Travis County to answer the charges set out in Applicant's indictment. Based on the evidence in the habeas record, I believe that Applicant has met her burden under her Article 11.073 new science claim. I dissent insofar as the Court grants Applicant relief under *Elizondo* and labels Applicant "actually innocent."

**Filed: January 22, 2026**
**Publish**